**REVISED September 2, 2014**
# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 30, 2014

Lyle W. Cayce
Clerk

No. 13-70025

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

SHERMAN LAMONT FIELDS,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC 6:01-CR-164-1

Before KING, JONES, and SMITH, Circuit Judges.

KING, Circuit Judge:

Petitioner-Appellant Sherman Lamont Fields was convicted of murder in a jury trial in federal district court and sentenced to death. We affirmed his conviction and sentence on direct appeal. Fields unsuccessfully sought habeas relief in the district court on numerous grounds, and now seeks a certificate of appealability to challenge the district court's denial of habeas relief. We hold that reasonable jurists could not debate the district court's conclusions and accordingly DENY Fields's request for a certificate of appealability.

No. 13-70025

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Escape and Murder of Suncerey Coleman

Sherman Lamont Fields was arrested in September 2001 for being a felon in possession of a firearm, and he was held in federal custody in a detention center in Waco, Texas.  In November 2001, while Fields was in custody, he bribed a correctional officer, offering him $5,000 for a key to the detention center's fire escape.  He used the key to escape on November 6.

That evening, Fields met with a friend, Edward Outley, who provided Fields with a car and a handgun.  Fields then visited his ex-girlfriend, Suncerey Coleman, at Hillcrest Hospital in Waco, where she was caring for her newborn child.  Fields was angry at Coleman for having seen other men while he was incarcerated.  Fields convinced Coleman to leave the hospital with him that evening, and drove her to Downsville, Texas, outside Waco.  Fields and Coleman had sexual intercourse,[1] and then he killed her by shooting her twice in the head.  Fields hid Coleman's body in underbrush near the road. Coleman's body was found two weeks later, on November 21.

Using a handgun, Fields later carjacked an employee of Hillcrest Hospital, Tammy Edwards, while she was exiting her car.  Edwards managed to escape, and Fields drove away in her car.

Police arrested Fields on November 24, 2001.  In May 2003, the government

> charged Fields by a seven-count indictment with (1) conspiring to escape from federal custody, (2) escaping from federal custody, (3) using and carrying a firearm during and in relation to escape, resulting in intentional murder, (4) carjacking, (5) using and carrying a firearm during and in relation to carjacking, (6) felon in

---

[1] As we noted on direct review, "[i]t is unclear whether the sex was consensual." *United States v. Fields*, 483 F.3d 313, 323 n.2 (5th Cir. 2007).

No. 13-70025

possession of a firearm, [and] (7) using and carrying a Ruger .22 caliber firearm during and in relation to escape.

*Fields*, 483 F.3d at 324. The government sought the death penalty on the murder charge.

## B. Fields's Trial

### 1. Guilt / Innocence Phase

Fields's trial took place in January and February of 2004. Fields represented himself *pro se*, with his appointed counsel acting as standby counsel. Fields pleaded not guilty to each charge. His defense was that he did not kill Coleman, but that his second girlfriend, Shalaykea Scroggins, did so with Outley. He contended that Scroggins was in "a passionately jealous rage" and shot Coleman in the back of the head, and that Outley, who was Scroggins's sister's boyfriend, shot Coleman a second time. The jury rejected Fields's defense and found him guilty on all counts.

### 2. Punishment Phase

Fields agreed to be represented by his appointed counsel during the punishment phase of the trial. After hearing the evidence, the jury recommended the death penalty. The district court sentenced Fields to death. The district court also sentenced Fields to 715 months of imprisonment on the noncapital counts.

## C. Post-Conviction Proceedings

### 1. Direct Appeal

On direct appeal, we rejected Fields's claims of sentencing error and trial error, and affirmed his convictions and sentences. *Fields*, 483 F.3d at 323.[2]

---

[2] Fields raised the following claims of sentencing error: the district court admitted testimonial hearsay in violation of Fields's Confrontation Clause rights; the district court's *Allen* charge was coercive; the government's use of a "televisual 'picture in picture' metaphor" at closing argument violated his due process and Eighth Amendment rights; the district court erred in admitting expert psychiatric testimony on future dangerousness; and the Federal

No. 13-70025

2.  Federal Habeas Petition

Fields filed several motions seeking to vacate his conviction pursuant to 28 U.S.C. § 2255, alleging a total of forty-nine claims.  The district court denied relief on all claims in its September 25, 2012 order, and found, *sua sponte*, that a certificate of appealability ("COA") should not issue.  Fields filed a motion to vacate or amend the district court's order denying his § 2255 motion, among other post-judgment motions, all of which the district court denied.

## II.    STANDARD OF REVIEW

"This court may not consider an appeal from the denial of a 28 U.S.C. § 2255 motion for relief unless either the district court or this court issues a COA." *United States v. Hall*, 455 F.3d 508, 513 (5th Cir. 2006) (citing 28 U.S.C. § 2253(c)(1)(B)); *see also United States v. Bourgeois*, 537 F. App'x 604, 610–11 (5th Cir. 2013) (unpublished).  To obtain a COA, Fields must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S.

---

Death Penalty Act violates the Sixth Amendment.  Fields also raised the following claims of trial error: the district court erred by failing to secure the advice of the Federal Public Defender before appointing capital counsel; the district court's refusal to appoint unconflicted substitute counsel rendered Fields's waiver of counsel involuntary and, relatedly, the court neglected its duty to inquire about the conflict; the district court erred in instructing the jury about the significance of the grand jury's decision to indict Fields; the district court erred in admitting into evidence photographs of the victim's body; the district court abused its discretion by requiring Fields to wear a stun belt during the trial; the district court erred by excluding a potential juror due to the juror's opposition to the death penalty; the government committed prosecutorial misconduct by eliciting inadmissible evidence, goading Fields with objections, making an improper sidebar remark, and making several improper remarks during the closing argument; the district court's management of Fields's standby counsel violated his due process rights; and lastly, Fields's convictions must be set aside for cumulative error.

4

No. 13-70025

322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  The Supreme Court has explained that "a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail."  *Id.* at 338.

In determining whether to grant a COA, "the court of appeals should limit its examination to a threshold inquiry into the underlying merit of [the petitioner's] claims."  *Id.* at 327.  This inquiry consists of "an overview of the claims in the habeas petition and a general assessment of their merits."  *Id.* at 336.  "[I]n a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor."  *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (alterations and internal quotation marks omitted).

## III.   DISCUSSION

Fields seeks a COA on the following claims: that (1) he received ineffective assistance of counsel because of his trial counsels' failure to: conduct a competent penalty phase investigation, conduct an adequate investigation related to the charged crime, and challenge expert testimony about Fields's future dangerousness; (2) he was incompetent to waive counsel; (3) his practice cross-examination of a government witness violated his constitutional rights; (4) the government violated its *Brady* obligations by failing to disclose exculpatory evidence and correct false testimony at trial; (5) Fields is actually innocent; (6) the district court's *Allen* charge was coercive; (7) security procedures during the trial, including the district court's requirement that Fields wear a stun belt, were prejudicial; (8) cumulative error requires that his convictions be set aside; and (9) the district court erred by failing to grant discovery or hold an evidentiary hearing.  We address each claim in turn.

### A. Ineffective Assistance of Counsel

Fields raises several separate claims of ineffective assistance of counsel ("IAC").  His three principal contentions are that he received ineffective

No. 13-70025

assistance because of trial counsels' failure to: conduct a competent penalty phase investigation, conduct an adequate investigation related to the charged crime, and challenge expert testimony about Fields's future dangerousness. For the reasons that follow, we deny a COA as to each of Fields's IAC claims.

1. Penalty Phase Investigation

In his § 2255 petition, Fields asserted that he received ineffective assistance of counsel because his counsel failed to conduct a competent penalty phase investigation. He included with his petition "critical mitigation evidence" that was readily available to his counsel, but which he claimed his counsel never presented to the jury. The district court reviewed this evidence and rejected Fields's IAC claim, finding the evidence contained in his § 2255 petition duplicative of that adduced at trial.

Fields now devotes nearly seventy pages of briefing to this issue, contending that reasonable jurists would debate the district court's rejection of his IAC claim because he has established that his counsels' performance was deficient and prejudiced him. Specifically, he contends that: (1) the district court "applied the wrong legal standard in evaluating his IAC claim"; (2) "trial counsel performed a sub-standard investigation and therefore presented inadequate mitigation evidence at trial"; (3) his "§ 2255 Motion presented voluminous mitigation evidence further demonstrating the ineffectiveness of counsel[s'] investigation"; and (4) "this new evidence establishes the prejudice caused by trial counsel[s'] incompetence and the reasonable probability of a different outcome had counsel been effective." Fields's arguments center on the specific mitigation evidence that he claims his trial counsel should have uncovered and presented during the penalty phase of the trial. This includes evidence of the terrible poverty, neglect, abuse, and trauma that he faced while growing up, his potential brain damage, his history of incarceration, and his mental illness and family history of mental illness.

6

No. 13-70025

We have reviewed the evidence provided by Fields, and for the reasons that follow, we conclude that reasonable jurists would not debate the district court's holding.  Accordingly, we deny Fields's claim for a COA.[3]

To succeed on an IAC claim, a defendant must show that (1) his "counsel's representation 'fell below an objective standard of reasonableness,'" and (2) the "counsel's deficient performance prejudiced the defendant." *Roe v. Flores-Ortega*, 528 U.S. 470, 476–77 (2000) (quoting *Strickland*, 466 U.S. at 688, 694).  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

The objective standard of reasonableness is measured "'under prevailing professional norms.'"  *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Strickland*, 466 U.S. at 688).  The Supreme Court has long referred to the American Bar Association's standards for capital defense work as "guides to determining what is reasonable." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003)[4];

---

[3] At the outset, we note that, contrary to Fields's contention, the district court applied the correct standard in conducting its IAC analysis; specifically, the district court applied the two-part test called for by *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

[4] The American Bar Association Guidelines explain that "Penalty Counsel's duty to investigate and present mitigating evidence is now well established."  ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7, cmt. (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 1021 (2003) [hereinafter "ABA Guidelines"].  The ABA Guidelines provide, in relevant part:

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant," "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history." At least in the case of the client, this begins with the moment of conception. Counsel needs to explore:

> (1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

> (2) Family and social history (including physical, sexual, or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or

*see also Bobby v. Van Hook*, 558 U.S. 4, 7–8 (2009). "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527.

The Court has explained that "'[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 690–91). The Court subsequently explained that "[a] tactical decision is a precursor to concluding that counsel has developed a reasonable mitigation theory in a particular case." *Sears v. Upton*, 130 S. Ct. 3259, 3265 (2010) (per curiam) (internal quotation marks omitted). "'[A] defendant who alleges a failure to investigate on the part of his counsel must

---

domestic violence; poverty, familial instability, neighborhood environment, and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one, or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3) Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

(4) Military service[] (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services)[.]

*Id.* at 1022–23 (footnotes omitted).

8

allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" *Trottie v. Stephens*, 720 F.3d 231, 243 (5th Cir. 2013) (quoting *Druery v. Thaler*, 647 F.3d 535, 541 (5th Cir. 2011)).

Prejudice is established if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Rompilla*, 545 U.S. at 390 (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Wiggins*, 539 U.S. at 534 (internal quotation marks omitted). "To assess that probability, we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)) (alteration in original).

   a. Evidence of Fields's poverty, neglect, abuse, trauma, and history of incarceration, as well as social history records and interviews of additional family members

We conclude that the district court's denial of relief on Fields's IAC claim concerning these areas of mitigation evidence is not debatable by reasonable jurists. Because it is important to consider the mitigating evidence presented during the trial's penalty phase before turning to the evidence in Fields's § 2255 motion, we first review this material.

Fields's penalty-phase investigation team included his counsel (Scott Peterson and Robert Swanton), a mitigation specialist (Jane McHan, now Bye), an investigator (Dan Youngblood), and a psychiatrist (Dr. J. Randall Price). In his affidavit, Swanton explains that he asked Dr. Price "to assess Mr. Fields'[s] intelligence and to offer defense strategy opinions regarding Mr. Fields after his interviews with Mr. Fields." He "also asked Dr. Price to assess the

relationship between Mr. Fields'[s] intelligence and his ability to adapt to prison, if Fields were sentenced to life." Swanton did not ask Dr. Price to conduct any neuropsychological testing of Fields, but he "knew Dr. Price had experience in the field of neuropsychology and would have relied on his opinion if he felt any such testing was warranted after his interviews with Mr. Fields."

In the defense's opening statement, Peterson told the jury that Fields had a "very disruptive, a very violent childhood," in which Fields "learned from the streets" and was exposed to his alcoholic mother's boyfriend, who beat his mother and whipped Fields and his siblings with a belt "on a regular basis." Peterson talked about Fields's family's move to the housing projects in Waco, and Fields's exposure there to "the drugs, the violence, the weapons, the alcoholism," and "[e]verything that we think of as bad in our society." He noted several "traumatic events" in Fields's early life, including his attempted suicide with his best friend at age fourteen, during which his friend died; the murder of another friend; his mother getting shot by her boyfriend; and his grandfather getting "run over by a drunk driver . . . in Sherman's presence." Peterson noted that Fields had been imprisoned for an extended period, including as a teenager.

Defense counsel called nine witnesses during the penalty phase of the trial. Three correctional officers testified about Fields's recent good behavior. Jane Bye testified about Fields's background, including the fact that his mother was on welfare around the time Fields was born; his abuse by his mother's boyfriend, William Bradford; the fact that his mother shot Bradford, for which she was incarcerated for fifty days; the fact that Fields began committing crimes the year after his mother was incarcerated; his family's difficult move to the projects; Fields's exposure to drugs, guns, and other types of crimes in the projects; the lack of supervision of Fields or his siblings; Fields's suicide attempt and his friend's death; the fact that three of his friends

died in violent fashion in 1989; the fact that Fields witnessed a drunk driver kill his grandfather; Fields's multiple attempts to commit suicide while at the Texas Youth Commission; and the fact that Melvin Swinnie, with whom Fields's mother was romantically involved after Bradford, shot her in the head in 1993.

Next, Fields's uncle, Vincent Green, testified about Fields's background, including the fact that Fields was present when his grandfather was killed; that the projects were dangerous; and that Fields told Green he wanted to leave the projects after his family moved there. Fields's grandfather's stepson, Reverend Edward Green, also testified about Fields's background, including the details of the day that Fields's grandfather was killed; the fact that the projects were a rough neighborhood and not a good environment for raising children; and his opinion that Fields's move to the projects was a "traumatic change." Adrian Dow, a prior girlfriend, testified that Fields was a positive influence on their daughter and treated Dow with respect. Fields's mother, Alice Swinnie, testified about Fields's background, including that her former boyfriend, Bradford, had an alcohol problem and beat her and her children; that the abuse continued from when Fields was around two years old until he was ten or eleven; that there were violence and drugs in the projects, to which Fields was exposed; that Swinnie was absent for extended periods of time because of the multiple jobs she worked, leaving Fields and his siblings unsupervised; that she shot Bradford and spent fifty days in prison as a result; that it was especially hard on Fields when she was imprisoned; and that another man she dated shot her in the head. She also testified that she believed Fields could change his life, and do "some good things," including continuing his education, if he received a life sentence. Lastly, Dr. Price testified about Fields's IQ and ability to adapt to a prison environment.

No. 13-70025

As this review makes clear, Fields's counsel investigated and presented evidence of Fields's poverty, neglect, abuse, attempted suicides, exposure to violence, incarceration while a teenager and later, and the death of close family members and friends. Thus, while Fields contends that his trial counsel should have found and presented precisely this type of evidence, the record reflects that his trial counsel did so.

The mitigating evidence presented generally falls into the category of "family and social history," as described by the ABA Guidelines: a category that includes physical and emotional abuse, domestic violence, poverty, familial instability, neighborhood environment, peer influence, and "other traumatic events such as exposure to criminal violence [or] the loss of a loved one." ABA Guidelines. As earlier noted, the ABA Guidelines are "guides to determining what is reasonable." *Wiggins*, 539 U.S. at 524. The fact that Fields's trial counsel investigated and presented evidence of each of these "family and social history" sub-categories is a strong indication that the district court's conclusion, that counsels' performance was reasonable, is not debatable.

Fields's argument that the mitigating evidence his trial counsel presented was inadequate because it was in "outline form" and "devoid of detail" is unpersuasive. The fact that the jury unanimously found the presence of nine mitigating factors, and found by a majority the presence of four other mitigating factors, belies Fields's argument.[5] The jury's answers to the

---

[5] The jury unanimously found the presence of the following nine statutory mitigating factors:

- The Defendant has lived most of his life without having a significant father figure.
- The Defendant has spent a large portion of his life incarcerated.
- The Defendant's periods of incarceration have included significant time in solitary confinement.
- The Defendant suffered from physical abuse during his formative years[.]
- The Defendant suffered from emotional abuse during his formative years.

mitigation questions indicate that the jury credited Fields's witnesses and gave careful consideration to the challenges that Fields faced. Nonetheless, the jury concluded that the aggravating factors outweighed the mitigating factors.

Fields analogizes to *Wiggins*, in which the Court found counsels' performance deficient where counsel "abandoned their investigation of [the] petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. Fields explains that *Wiggins* "makes it clear that conducting some mitigation investigation does not suffice," as opposed to conducting a full investigation.

*Wiggins* is distinguishable and does not support Fields's argument. In *Wiggins*, "counsel introduced *no evidence* of Wiggins' life history" during the punishment phase of the trial. *Id.* at 515 (emphasis added). The Court's focus was on "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*." *Id.* at 523. The Court concluded it was not. *Id.* at 533. Counsels' investigation

---

- The Defendant suffered from parental neglect during his formative years.
- The Defendant is the product of an impoverished background which impaired or hampered his integration into the social and economic mainstream of society.
- The Defendant's mother has a history of criminal behavior and incarceration.
- The Defendant was exposed to the violent deaths of family members, loved ones, and friends during his formative years.

The jury found the presence of the following four statutory mitigating factors by a majority:

- The imposition of a death sentence would cause emotional injury, harm and loss to the Defendant's mother, children and other family members. [11 jurors]
- That as the Defendant ages, his behavioral problems may decrease. [11 jurors]
- The Defendant can be of some productive value in a prison setting. [9 jurors]
- The Defendant grew up in an atmosphere of violence and fear, which misshaped his perception as to the acceptability or necessity of violent conduct. [7 jurors]

13

relied on only three sources: a psychologist's examination, a presentence investigation report, and records kept by the Baltimore City Department of Social Services ("DSS") documenting the petitioner's placement in foster care. *Id.* at 523. Counsel did not prepare any social history report, *id.* at 524, and did not pursue leads suggested by the DSS documents, including the petitioner's mother's alcoholism or the effect of foster care on the petitioner, *id.* at 525. Counsel did not discover the petitioner's exposure to severe physical and sexual abuse by his mother and while under the care of foster parents. *Id.* at 516, 525, 535. The Court concluded that counsels' deficient performance prejudiced the petitioner. *Id.* at 535–36.

Here, by contrast, counsel investigated and introduced evidence of Fields's social history through multiple witnesses, a mitigation specialist among them. Fields's counsel investigated numerous sources, unlike the three sources relied on by trial counsel in *Wiggins*. *Id.* at 533. As indicated by Bye's testimony, Fields's trial counsel and mitigation team conducted a thorough investigation of Fields's background and social history, which revealed Fields's physical abuse; suicide attempts; exposure to drugs, guns, and violence; and the deaths of friends and family members in violent fashion, among other topics.[6] Finally, unlike in *Wiggins*, where trial counsel did not uncover pervasive sexual abuse, *id.* at 525, there is no indication here that trial counsel

---

[6] *See also* Affidavit of Jane Bye ("My duties on this case included investigating Mr. Fields'[s] social and mental health history, consulting with the attorneys, the investigator, and other members of the defense team."; "In the course of my work, I learned that Mr. Fields had experienced a great deal of trauma in his life. Mr. Fields had witnessed a great deal of violence and had lost friends and family members in a violent manner. He had attempted suicide more than once."); February 3, 2004 Trial Transcript (testimony of Jane Bye) (describing investigatory steps she undertook to gather information).

failed to uncover or investigate any such issue in Fields's background (with the exception of Fields's mental health, which we address below).[7]

Lastly, Fields contends that the new evidence he offers is "materially different" from the evidence presented by trial counsel. However, our review of the evidence presented at trial, when compared to the additional evidence Fields claims his counsel should have discovered, convinces us that reasonable jurists would not disagree with the district court's determination that the new evidence is not materially different from that presented at trial. Rather, it offers more detail about each category of mitigation evidence, but duplicates the evidence already presented.

Accordingly, we conclude that reasonable jurists would not debate the district court's holding.

### b. Mental illness and family history of mental illness

We similarly conclude that reasonable jurists would not debate the district court's rejection of Fields's IAC claim with respect to his counsels' performance in presenting mitigating evidence of Fields's mental illness and

---

[7] *Escamilla v. Stephens*, No. 12-70029, --- F.3d ---, 2014 WL 1465361 (5th Cir. Apr. 15, 2014), to which Fields directs our attention in a Rule 28(j) letter, is distinguishable on this basis, as well. There, we granted a COA on the petitioner's deficient mitigation investigation claim where counsel neglected to obtain unredacted versions of the petitioner's Texas Youth Commission reports, "unreasonably relied upon" the petitioner's family members' descriptions of the petitioner's childhood as "stable," and "declined to hire a mitigation specialist, failed to obtain a psychological evaluation for their client until after trial began, and failed to ensure that the expert evaluating [the petitioner] was aware of his family background and social history." *Id.* at *9. We found prejudice, noting that the "jury that sentenced [the petitioner] to death was presented with evidence that [the petitioner] was a 'pretty normal' kid until age eleven," despite the fact that the petitioner faced "disadvantages, instability, and trauma" as a child. *Id.* at *10. This included the petitioner's suffering a "violent and abusive upbringing" and his "untreated substance abuse problems." *Id.* at *3.

Here, counsel presented evidence of the disadvantages, instability, and trauma that Fields faced during his childhood. Unlike in *Escamilla*, Fields's jury heard evidence of Fields's abusive upbringing, among other topics. Moreover, counsel hired a mitigation specialist, Jane Bye, who testified at length about Fields's background. For these reasons, *Escamilla* is distinguishable.

family history of mental illness.  The mental illness evidence adduced during the penalty phase of the trial consisted of the following:

- Fields received psychiatric and psychological treatment while at the Texas Youth Commission (testimony of Jane Bye);
- Fields's mother suffered from mental retardation (testimony of Jane Bye);
- Fields had been diagnosed with an antisocial adolescent behavior disorder (testimony of Dr. Price on cross-examination).

In Fields's habeas motion, he presented evidence of diagnoses of bipolar disorder and post-traumatic stress disorder ("PTSD"), and a family history of mental illness.  In ruling on Fields's motion, the district court acknowledged the "relative paucity of evidence regarding [Fields's] history of mental illness and his family's history of mental illness" that was presented during the trial, as well as the fact that "further information regarding any mental illness suffered by [Fields] or the genetic predisposition to mental illness based on his family history could have been mitigating if true."

With respect to the other categories of mitigation evidence discussed above, such as abuse and trauma, trial counsel presented *some* evidence of the issue, and Fields seeks to have *more* evidence considered now.  With respect to the mental health evidence, however, trial counsel presented no evidence of Fields's bipolar disorder or PTSD, nor of Fields's family history of mental illness (beyond the mention of Fields's mother's mental retardation, which the testimony suggested may derive, in part, from her being shot in the head).

Assuming without deciding that counsels' performance was deficient, we conclude that the district court's holding that counsels' performance did not prejudice Fields is not debatable.  The district court held that Fields could not establish prejudice because "additional evidence of [Fields's] specific mental illnesses could possibly have been utilized as evidence that [Fields] was a future danger to society," and the "record reflects that the government had

presented compelling aggravating evidence regarding [Fields's] future dangerousness." We have considered "the totality of the available mitigation evidence," and performed the required reweighing of this evidence against that in aggravation. *Porter*, 558 U.S. at 41. The district court's holding is not debatable because there is not a probability "sufficient to undermine confidence in the outcome," *Wiggins*, 539 U.S. at 534, that, if trial counsel had presented the mitigating evidence of mental illness to the jury, the jury would have reached a different result.

Evidence of mental illness can be mitigating, in that it can influence a jury's appraisal of a defendant's moral culpability. *Porter*, 558 U.S. at 454. However, such evidence can also be "double-edged," as the district court noted, since it can lead a jury to conclude that a defendant poses a future risk of violence. *Martinez v. Quarterman*, 481 F.3d 249, 255 (5th Cir. 2007); *see also Vasquez v. Thaler*, 389 F. App'x 419, 429 (5th Cir. 2010); *Woods v. Thaler*, 399 F. App'x 884, 895 (5th Cir. 2010).

The mental health evidence that Fields asserts should have been presented may have led the jury to find an additional mitigating factor related to that evidence. However, even if the jury made such a finding, the jury would have weighed it, along with the other mitigating factors, against the severe aggravating factors that led the jury to impose the death penalty in the first place.[8]  Reasonable jurists would not disagree with the district court's

---

[8] The jury unanimously found the presence of the following statutory aggravating factors:

- The death, or the injury resulting in death, of the victim, Suncerey Coleman, occurred during the commission or attempted commission of an offense, that is, escape.
- The defendant, Sherman Lamont Fields, has previously been convicted of a federal or state offense punishable by a term of imprisonment of more than one year involving the use or the attempted or threatened use of a firearm against another person.

No. 13-70025

conclusion that the jury's calculus would not have changed if such evidence had been presented.

The jury heard ample mitigating evidence, and found nine statutory mitigating factors unanimously and another four by a majority. Nonetheless, the jury concluded that the aggravating factors outweighed these mitigating factors, and sentenced Fields to death. The jury heard testimony that Fields: escaped from prison, subsequently murdered Coleman, and later carjacked Edwards while using a gun; shot a man in the head during a drive-by shooting in 1991, pled guilty to attempted murder, and received an eight-year prison sentence for the crime; participated in another drive-by shooting in 2000; raped and beat his ex-wife, April Fields, threatened to kill her, and at one point drove her to a dark, wooded area where he made her get out of the car and pulled a

---

(The jury did not unanimously find the presence of the statutory aggravating factor that Fields "committed the offense after substantial planning and premeditation to cause the death of the victim, Suncerey Coleman.")

Lastly, the jury unanimously found the presence of the following three non-statutory aggravating factors:

- The defendant, Sherman Lamont Fields, caused injury, harm, and loss to Suncerey Coleman, her family and children, and her friends as demonstrated by the victim's personal characteristics as an individual, including the fact that she was a new mother to a prematurely born infant, and the impact of her death upon her family, children and friends.
- Prior to the murder of Suncerey Coleman, the defendant, Sherman Lamont Fields, participated in attempted murders and other serious acts of violence. Serious acts of violence means serious criminal activity, causing or intending to cause serious bodily injury or death; not trivial, accidental, reckless or negligent acts.
- The defendant, Sherman Lamont Fields, is likely to commit serious acts of violence in the future which would be a continuing and serious threat to the lives and safety of others, including, but not limited to, inmates and correctional officers in an institutional correctional settings [sic], as evidenced by the offenses charged in this case and the statutory and non-statutory aggravating factors alleged in this case. In addition to the capital offense charged in this case and the statutory and non-statutory aggravating factors alleged in this case, Sherman Lamont Fields has engaged in a continuous pattern of violent conduct, has threatened others with violence, has demonstrated low rehabilitative potential, has made specific admissions of violence, is an escape risk, and/or has demonstrated lack of remorse.

18

gun on her, but decided not to kill her; attempted to escape from prison after his arrest for Coleman's murder by removing an air vent in the ceiling; and engaged in violent conduct and threatened the lives of correctional officers and their families while he was imprisoned. The jury found, unanimously, that Fields "participated in attempted murders and other serious acts of violence" before killing Coleman. The jury concluded, also unanimously, that Fields "is likely to commit serious acts of violence in the future which would be a continuing and serious threat to the lives and safety of others."

Given Fields's violent crimes, his history of violence, the jury's finding that he posed a risk of future violence, and the fact that evidence of mental illness can be "double-edged," *see Vasquez*, 389 F. App'x at 429, *Woods*, 399 F. App'x at 897, reasonable jurists would not debate the district court's holding that the verdict would not have changed even had the jury heard evidence of Fields's mental illnesses. Accordingly, we deny a COA.[9]

### c. Potential brain damage

Lastly, we conclude that reasonable jurists would not debate the district court's rejection of Fields's IAC claim with respect to his counsels' performance in not further investigating or presenting mitigating evidence of brain damage. Dr. Price, the clinical and forensic psychologist and neuropsychologist who was a member of Fields's penalty phase investigation team, stated in his declaration that he "did not conduct any neuropsychological testing on Mr. Fields as [he] did not find any suggestion of congenital or acquired brain damage." Fields's counsel, Swanton, stated in his declaration that he "would have relied on [Dr. Price's] opinion if he felt any [neuropsychological] testing

---

[9] The fact that the district court issued an *Allen* charge does not affect this conclusion, contrary to Fields's argument. The *Allen* charge, by itself, does not demonstrate that the jury was so deadlocked such that the presentation of additional mitigation evidence would have altered the outcome. (Moreover, as explained *infra*, Fields's *Allen* charge claim is barred.)

No. 13-70025

was warranted after his interviews with Mr. Fields." In his habeas materials, Fields does not provide any evidence of brain damage; rather, he speculates that brain damage may have occurred due to his upbringing and attempted suicides. Based on counsels' reliance on Dr. Price's opinion and the lack of evidence of brain damage offered by Fields, jurists of reason would not debate the district court's conclusion that counsels' performance was not unreasonable.

2. Investigation of the Homicide

Fields's second IAC claim is that his counsel failed to conduct an adequate investigation into the facts of the charged homicide. Specifically, he asserted in his § 2255 petition that counsel did not interview the following three potential witnesses:

> Renee "Na-Na" Alberta Hampton, who Fields contends was an eyewitness to the crime. . . . Edward Outley III, who Fields asserted was an accomplice to the actual killer, Shalaykea Scroggins. . . . [And] Debra Alexander, a witness that the Government identified as one who could corroborate Fields'[s] defense that Scroggins was the actual killer.

He also argued that counsel only investigated and interviewed a small number of the government's witnesses. The district court rejected Fields's claim, finding that he failed to indicate what facts the uncalled witnesses would have testified to or how their testimony would have changed the outcome of the trial. The district court also concluded that Fields failed to establish how additional investigation or interviews would have uncovered favorable testimony for him or otherwise altered the trial's outcome.

Fields suggests that the district court's holding is debatable because: his counsel was ineffective; *Moore v. Quarterman*, 534 F.3d 454 (5th Cir. 2008), indicates that he should have an opportunity to develop the factual record; the district court improperly stated that Fields never sought a continuance to

20

subpoena witnesses, when in fact the court had foreclosed this possibility; and the district court failed to address his claim concerning his counsels' investigation of witnesses on the government's witness list. We deny a COA because jurists of reason could not disagree with the district court's rejection of Fields's arguments.

"[A] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Trottie*, 720 F.3d at 243 (internal quotation marks omitted). We have explained that "[c]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified are largely speculative." *Sayre v. Anderson*, 238 F.3d 631, 635–36 (5th Cir. 2001) (internal quotation marks omitted). To prevail on such a claim, "the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

Reasonable jurists would not debate the district court's holding because Fields's allegations about the testimony of uncalled witnesses are "largely speculative," *see Sayre*, 288 F.3d at 635–36, and he fails to "allege with specificity" what the investigation would have revealed about Hampton, Alexander, and Outley, or "how it would have altered the outcome of the trial," *Trottie*, 720 F.3d at 243 (internal quotation marks omitted). Fields's counsel attempted to interview Hampton, but she refused to speak with the defense investigator, as Fields acknowledges in his petition. Moreover, Fields does not allege with specificity what Hampton would have stated had she testified; he merely asserts that she was a "potential eyewitness to the murder." Similarly, Fields only asserts that Alexander could "corroborat[e] Fields'[s] defense that

Scroggins was the actual killer." Fields's statement that Outley is "alleged to be an accomplice to the actual killer," is also conclusory and devoid of specifics. Furthermore, Outley testified at trial, thereby providing Fields with an opportunity to cross-examine him about his alleged role in Coleman's murder. Fields does not indicate how the testimony of any of the witnesses would have changed the outcome of the trial, *Trottie*, 720 F.3d at 243, and therefore, cannot establish that the district court's holding is debatable.[10]

*Moore*, to which the district court analogized, does not help Fields. Like the petitioner there, Fields has not indicated what the additional witnesses "would have testified to." *Moore*, 543 F.3d at 468. The fact that the petitioner in *Moore* received an evidentiary hearing does not entitle Fields to one, because the record is adequate to dispose of his claim, as discussed *infra*.

Fields's argument that his counsels' performance was deficient because they only interviewed "four of the fifty-nine witnesses" who testified for the government is unpersuasive. As with Fields's claims concerning Hampton, Alexander, and Outley, Fields fails to allege what the investigation of the additional government witnesses would have revealed or how it would have altered the trial's outcome. His conclusory argument and appeal to bare numbers does not make the district court's holding debatable. *Trottie*, 720 F.3d at 243.

Fields's contention that his trial counsel only investigated "73 of the 120 witnesses" on the government's witness list, and that this investigation was

---

[10] The district court's observation that Fields did not seek a continuance "to interview and possibly subpoena witnesses" did not affect its conclusion that Fields's arguments regarding the uncalled witnesses were devoid of the specific allegations necessary to obtain relief. Moreover, Fields's assertion that such a continuance was foreclosed by the district court's statement during pretrial proceedings that further delay was "not going to happen" is misleading; the district court's point was that Fields could have sought to interview and subpoena witnesses at an earlier date.

limited to open-file review of the government's work, is unconvincing for similar reasons.  At no point does Fields state what his trial counsel would have discovered from additional investigation of these witnesses.  Moreover, Fields does not indicate how the investigation of these other witnesses would have altered the outcome at trial.  *See Trottie*, 720 F.3d at 243.

For these reasons, we conclude that no reasonable jurist would debate the district court's denial of Fields's claim.

3.  Failure to Adequately Challenge Expert Testimony[11]

Fields's final standalone IAC claim is that his trial counsel failed to adequately challenge the admissibility of the testimony of Dr. Coons, the government's expert on future dangerousness, or to adequately attack Dr. Coons's methodology and conclusion that Fields posed a risk of future dangerousness.  For the reasons that follow, we deny a COA on Fields's claim.  Because our analysis requires careful consideration of the challenges that Fields's counsel levied against Dr. Coons at trial, we first review this material.

Dr. Richard Coons, a forensic psychiatrist, testified during the penalty phase of the trial.  *Fields*, 483 F.3d at 341.  Fields's attorneys learned what Dr. Coons would testify concerning two days before he testified.  Dr. Coons did not prepare a written report.  Before Dr. Coons testified, Fields's counsel moved to examine him outside the presence of the jury to make a challenge pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), which the district court granted.  During the voir dire, Fields's counsel stated as a fact that "the American Psychiatric Association ["APA"] has essentially taken the position that the area of future dangerousness is not one that can be predicted with any sort of regularity or scientific regularity."  Fields's counsel questioned

---

[11] As with several of Fields's arguments on appeal, this one encompasses multiple claims from his § 2255 petition.  We address each claim below.  For Fields's subsequent multiple-claim arguments, we address the claims as they are grouped on appeal.

Dr. Coons regarding the empirical data he relied on in reaching his determination, his awareness "of the studies that indicate that the prediction of future dangerousness is not reliable," the lack of peer review of Dr. Coons's findings, and the fact that Dr. Coons's findings cannot be scientifically tested. Dr. Coons admitted that he did not perform any follow-up studies in connection with his previous determinations of future dangerousness.

The court overruled Fields's objections and allowed the government to call Dr. Coons to testify. As we explained on direct appeal,

> After Dr. Coons testified regarding his education and experience, the prosecutor posed a hypothetical, which consisted of the facts of the instant capital murder and some of Fields's background and criminal history. Based upon this hypothetical, the prosecutor asked Dr. Coons whether such an individual would constitute a future danger to others, including persons in a correctional facility. Dr. Coons responded that there was a "probability of future violence."

*Fields*, 483 F.3d at 341. During cross-examination, Fields's counsel elicited several admissions from Dr. Coons regarding his conclusions: Dr. Coons stated that there is a "considerable subjective element" to his opinion; he could not identify a study validating an expert's subjective opinion about a prisoner's future dangerousness; he admitted that his opinion had not been subjected to peer review; he admitted that he could not provide an error rate for his opinion; he admitted that he did not know the APA's position on future dangerousness and that some members of the organization "have difficulty with the issue"; he admitted that there is a possibility Fields will not be dangerous in the future; he admitted that he had reviewed Fields's records, and stated that he did not know of any instance of Fields "actually physically injuring a guard"; and he stated that there are studies indicating that as prisoners age, they are less likely to be violent.

No. 13-70025

The district court rejected Fields's claim, finding that he could not establish that his counsels' performance was deficient or prejudicial. We conclude that reasonable jurists would not debate the district court's holding, because Fields fails to show that his trial counsels' performance was deficient, either in adequately challenging the admissibility of Dr. Coons's testimony before trial,[12] or in adequately attacking Dr. Coons's methods and conclusion during trial, such as by introducing evidence to counter Dr. Coons's assessment. Fields's trial counsel made a *Daubert* challenge to Dr. Coons's testimony, performed a voir dire of Dr. Coons, and objected to the admission of Dr. Coons's testimony. *See Fields*, 483 F.3d at 341. Once the district court overruled counsels' objections, counsel performed a cross-examination of Dr. Coons during which counsel elicited several admissions from him regarding his methodology and the scientific validity of his conclusions.

Considering the record and these circumstances, reasonable jurists would not debate the district court's holding that trial counsels' performance did not fall below an objective standard of reasonableness. *See Flores-Ortega*, 528 U.S. at 476–77. Fields's counsel challenged Dr. Coons's conclusion on multiple grounds, revealing its subjectivity and casting doubt on its scientific or statistical validity. Thus, trial counsel undertook precisely what Fields argues he failed to do: he attacked Dr. Coons's methodology and techniques.

Fields's reliance on *Gobert v. State*, No. AP-76345, 2011 WL 5881601 (Tex. Crim. App. Nov. 23, 2011), and *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010), for the proposition that these cases "fully repudiated" Dr. Coons's

---

[12] Dr. Coons's qualification as an expert under *Daubert* is not at issue in this appeal, since Fields does not brief it and we decided the issue on direct appeal. *See Fields*, 483 F.3d at 341–45. Challenges to issues decided on direct appeal are foreclosed from consideration in a § 2255 motion. *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986). Thus, to the extent Fields faults his counsel for failing to adequately object to Dr. Coons's admissibility as an expert, such a claim is foreclosed by our prior opinion. *Id.*

methodology and techniques, and therefore demonstrate that the district court's opinion is incorrect, is unavailing.[13]  Ineffective assistance of counsel was not an issue in *Coble* or *Gobert* with respect to Dr. Coons's testimony. Rather, the primary question in both cases concerning Dr. Coons's testimony was its admission pursuant to Texas's evidentiary rules.  *Coble*, 330 S.W.3d at 270; *Gobert*, 2011 WL 5881601, at *6–7.  As a result, the cases' bearing here is limited.  Moreover, as earlier noted, we decided the issue of Dr. Coons's admissibility on direct appeal, so its consideration is foreclosed here.

---

[13] In *Coble*, 330 S.W.3d at 270, the court considered the admissibility of Dr. Coons's expert testimony about the appellant's future dangerousness.  Although the court agreed with the appellant that Dr. Coons's testimony was improperly admitted under Texas Rule of Evidence 702 because "it was insufficiently reliable," *id.*, the court concluded that the admission of the testimony did not affect the appellant's substantial rights to a fair sentencing hearing, *id.* at 286.  The court gave five reasons for its conclusion: (1) "[t]here was ample other evidence supporting a finding that there was a probability that appellant would commit future acts of violence"; (2) "[t]he same basic psychiatric evidence of appellant's character for violence was admissible and admitted, without objection, through other, entirely objective, independent medical sources—the reports by Dr. Hodges and the military doctor years before appellant committed these murders"; (3) "Dr. Coons's opinion was not particularly powerful, certain, or strong," coming as it did "after an extremely long and convoluted hypothetical," and simply stating, "there is a probability that" the appellant would be a continuing threat; (4) "Dr. Coons's testimony was effectively rebutted and refuted by" another expert, Dr. Cunningham, "who not only relied upon specifically listed scientific materials and data during his testimony, but who also noted that Dr. Coons and his methodology had been criticized by both the American and Texas Psychological Association"; and (5) the prosecution "barely mentioned Dr. Coons during closing argument and did not emphasize him or his opinions." *Id.* at 286–87.

Similarly, in *Gobert*, the court concluded that the trial judge "abused his discretion in admitting Dr. Coons's opinion on future dangerousness in this case for the same reasons that we held it inadmissible in *Coble v. State*." 2011 WL 5881601, at *7 (internal footnote omitted). However, the court found that the admission was harmless error, explaining, "[g]iven the overwhelming evidence of appellant's life-long penchant for violence, the circumstances of the capital murder, the evidence of his conspiracy to commit capital murder to effectuate his escape from jail, [and] his own testimony concerning his prior violence in prison and toward anyone—including his own mother—who angers him, we are confident that this error did not affect appellant's substantial rights to a fair sentencing trial." *Id.* The court also noted that the prosecution did not "emphasize or rely upon" Dr. Coons's testimony during closing argument. *Id.*

No. 13-70025

It is true that Fields's counsel did not call an expert to rebut Dr. Coons, as counsel did in *Coble*. *See Coble*, 330 S.W.3d at 282. However, this distinction does not indicate that the district court's holding concerning counsels' performance is debatable, given that counsel attacked Dr. Coons's methodology and conclusion at length on cross-examination.

Fields's contention that his counsels' deficient performance is evidenced by Swanton's acknowledgement that he "did not conduct any additional research or review prior transcripts of Dr. Coons'[s] testimony," and by the fact that Swanton did not prepare a written challenge to Dr. Coons's testimony, is unpersuasive. Swanton's affidavit indicates that while he did not conduct additional research, he did not do so *because* "[he] had previously tried cases involving Dr. Coons, so [he] was familiar with [Dr. Coons's] approach to predicting future dangerousness." Swanton notes that he "attacked Dr. Coons'[s] methodology" during his cross-examination, "rather than the 'facts' underlying [Dr. Coons's] opinion." Similarly, Swanton did not submit a written challenge to Dr. Coons's testimony because the government did not prepare a written *Daubert* report. Given our review of the record, we cannot say that reasonable jurists would debate that district court's holding.

Fields argues that his trial counsel was deficient for failing to introduce evidence that the Bureau of Prisons was equipped to prevent violence within its prisons by using super-maximum facilities. The district court rejected this argument, concluding that Fields's counsel "reasonably focused" on establishing that Fields's violent tendencies would decrease over time, "[r]ather than presenting evidence" on "super-secure facilities." Jurists of reason would not debate the district court's holding. Fields's counsel focused on Fields's recent improved behavior, and on studies suggesting that his behavior would continue to improve with age, rather than focusing on the safeguards available at Bureau of Prisons facilities, which "may have

27

reinforced to the jury the idea that [Fields] would always remain a future danger," as the district court found.  Fields's counsel called multiple prison employees who testified that Fields's behavior had improved during his imprisonment; defense witness Dr. Price testified that he agreed with studies showing that behavioral problems decrease with age; and Dr. Coons acknowledged these studies.  Moreover, Dr. Price's affidavit explains that Swanton decided "to limit the extent of information presented about [Fields's] risk to engage in violent behavior in prison due to his prior behavior while incarcerated."  Fields has not shown that the district court's holding is debatable, or given us reason to second-guess counsels' strategic decision not to explore this topic.  *See Strickland*, 466 U.S. at 681.

Fields also fails to establish that the district court's holding that he was not prejudiced by any deficient performance of counsel is debatable.  The jury was present for Fields's counsels' cross-examination of Dr. Coons, and heard the challenges to Dr. Coons's methodology.  The jury also heard other testimony that could have lead it to conclude that Fields posed a risk of future dangerousness, including testimony about his numerous prior acts of violence, successful escape from prison, escape attempt after being imprisoned for Coleman's murder, and threats to correctional officers.  Given these facts, and the jury's unanimous findings that Fields had "participated in attempted murders" in the past and "is likely to commit serious acts of violence in the future," reasonable jurists would not debate the holding of the district court that there is not a probability "sufficient to undermine confidence in the outcome," *Wiggins*, 539 U.S. at 534, that, if Dr. Coons's testimony had not been

admitted or counsel had offered a defense expert to rebut Dr. Coons, the jury would have reached a different result.[14]

Fields's arguments that the admission of Dr. Coons's testimony "worked an independent violation" of his Fifth and Eighth Amendment rights and constituted error "as a matter of federal evidence law under the Federal Death Penalty Act" are barred because we decided them on direct appeal. *Fields*, 483 F.3d at 343–45; *see Kalish*, 780 F.2d at 508. For these reasons, we conclude that reasonable jurists would not debate the district court's holding, and we deny a COA.

### B. Competency to Waive Counsel

Fields contends that he suffers from mental illness and was incompetent to waive counsel, that the district court's pretrial inquiry into his competence was constitutionally inadequate, and that his counsels' performance was deficient because counsel failed to conduct an adequate investigation into his competence "despite numerous red flags." He contends that reasonable jurists would debate the correctness of the district court's decision to deny relief. We conclude that reasonable jurists would not debate the district court's holding, and deny a COA.

---

[14] We also note that the factors the *Coble* court looked to, in concluding that the admission of Dr. Coons's testimony was harmless, similarly suggest that any error here was not prejudicial. As in *Coble*, "there was ample evidence that there was a probability that [Fields] would commit future acts of violence quite apart from Dr. Coons's testimony." 330 S.W.3d at 281. Additionally, "Dr. Coons's opinion was not particularly powerful, certain, or strong," coming as it did "after an extremely long and convoluted hypothetical," and simply stating "there is a probability that" Fields would be a continuing threat. *Id*. at 286. Lastly, as in *Coble*, "the prosecution did not rely heavily upon Dr. Coons's testimony during its closing arguments." *Id*. at 283. The government did not mention Dr. Coons or his research in the closing argument, and instead reminded the jury of Fields's past violent conduct, and asked the jury consider the "track record of [Fields's] choices," and his "pattern of conduct," in determining if he posed a risk of future dangerousness. These facts belie Fields's argument that Dr. Coons was "the focal point" for the government's case about his future dangerousness.

No. 13-70025

### 1. Factual Background

While awaiting trial, Fields moved to appear *pro se* on multiple occasions, only to subsequently withdraw his motions.[15]  Again during the pretrial hearing, Fields requested to waive counsel and proceed *pro se*.  He informed the district court that he felt his appointed counsels' "actions are suspicious and I think they're working with the prosecutor instead of working for me."  He stated that his counsel "prepared a strategy . . . in an attempt to try to get me a life sentence when I repeatedly profess my innocence."  The district court indicated that it would not appoint replacement counsel at that point in the proceedings.  The district court informed Fields of his right to represent himself, and indicated that it would need to ensure that Fields was waiving his right to counsel voluntarily and intelligently.  The district court proceeded to evaluate Fields's understanding of the nature of the proceedings and his decision to proceed *pro se*.  The district court cautioned Fields against taking such a course of action, and twice asked Fields if he "still want[ed] to represent [him]self," to which Fields replied in the affirmative.

The government suggested that the district court arrange for an evaluation of Fields's competency and capacity, in light of the defense's offering of diminished capacity as a possible mitigation instruction.  Fields's defense counsel agreed, requesting that the court arrange for Fields to be examined "out of an abundance of caution."  Fields's counsel noted that Dr. Price had evaluated Fields, and determined that he had an IQ of 114 and was "fairly

---

[15] Fields moved to "represent self" on September 25, 2002, and moved to appear *pro se* on March 4, 2003.  He moved to withdraw his motion to appear *pro se* on April 30, 2003, which the district court granted, thereby mooting his motion to "represent self."  Fields again moved to appear *pro se* on August 12, 2003.  The district court held a motion hearing on Fields's request, at which "Defendant stated that he no longer pursues this request."  The docket sheet indicates that "Defendant was warned by the Court that if he decides to complain about his attorneys in the future it would not delay or continue his trial date."

bright."  The court noted that the current proceedings were taking place on a Friday afternoon, with voir dire set to begin the following Monday morning. Nonetheless, the district court arranged for an evaluation of Fields by a psychiatrist, Dr. Stephen Mark, at 8:00 a.m. that Monday morning, prior to the beginning of voir dire.  Dr. Mark evaluated Fields and reported that Fields "has had some history of depression in the past and maybe some now with his current situation, but it does not interfere with the competency."  Dr. Mark stated that Fields

> is not psychotic. He is not organic. He appeared able to think through questions and not distract. He appeared able to make decisions adequately for himself. In terms of the specific question can he make the decision to represent himself and be competent, the answer is yes. He is competent to do so.

The district court permitted Fields to proceed *pro se*, with his appointed counsel acting as standby counsel.

### 2.  Applicable Law

The Constitution "does not permit trial of an individual who lacks 'mental competency.'"  *Indiana v. Edwards*, 554 U.S. 164, 170 (2008).  "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."  *Drope v. Missouri*, 420 U.S. 162, 171 (1975); *see also Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) ("[T]he test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.") (internal quotation marks omitted).  In *Faretta v. California*, 422 U.S. 806, 807 (1975), the Court held that the Sixth and Fourteenth Amendments include a "right to

proceed without counsel when" a criminal defendant "voluntarily and intelligently elects to do so."

In *Edwards*, the Court addressed "the relation of the mental competence standard to the right of self-representation." 554 U.S. at 170. The Court clarified that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Id.* at 178. The Court noted that "the trial judge . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Id.* at 177. We have explained that *Edwards*'s "new rule applies only in the 'exceptional' situation where a defendant is found competent to stand trial and elects to appear *pro se*, but is so severely mentally ill that his self-representation threatens an improper conviction or sentence." *Panetti v. Stephens*, 727 F.3d 398, 414 (5th Cir. 2013), *petition for cert. filed* (Jan. 27, 2014) (No. 13–8453). *Edwards* is also "*permissive*, allowing the state to insist on counsel, but not requiring that the state do so." *Id.* In *Panetti*, we concluded that *Edwards* is not retroactively applicable on collateral review. *Id.* at 414–15.

There are "'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed.'" *United States v. Flores-Martinez*, 677 F.3d 699, 706 (5th Cir. 2012) (quoting *Drope*, 420 U.S. at 180). Rather, "'the question is a difficult one in which a wide range of manifestations and subtle nuances are implicated.'" *Id.* (quoting *Drope*, 420 U.S. at 180). "'[I]n determining whether the court should order a mental competency hearing, the court must consider three factors: (1) the existence of a history of irrational behavior, (2) the defendant's demeanor at trial, and (3)

No. 13-70025

prior medical opinion on competency.'" *Id.* at 706–07 (quoting *United States v. Ruston*, 565 F.3d 892, 902 (5th Cir. 2009)).

      3. Analysis

          a. Fields's competency to waive counsel

The district court rejected Fields's competency arguments, finding his waiver of counsel intelligent and voluntary, and explaining that his "demeanor before the Court at the pretrial hearing and in previous hearings reflects that he had the ability to consult with his lawyer and the Court with a reasonable degree of rational understanding and that he had a rational understanding of the criminal proceedings against him." The district court noted that Fields's *pro se* filings showed that "he rationally understood the criminal proceedings." As a result, the court concluded that Fields was competent to waive his right to counsel.

Fields argues that the district court failed to reevaluate its competency conclusion and rejected Fields's new evidence, and that he is therefore entitled to relief on his claim. He contends that his mental illnesses and their symptoms, including "paranoid ideation, delusional thinking, irritability, impaired judgment and impulse control, and grandiosity," impaired him to such a degree that he did not meet the *Dusky* standard for mental competency, rendering him unfit to "stand trial, waive counsel and proceed with his own defense." He asserts that the evidence from his § 2255 motion supports this argument, including: a declaration from Dr. George Woods, a psychiatrist, opining that Fields's symptoms "impaired his competency to waive his right to counsel" and that Fields was not "competent to waive counsel and/or represent himself"; documents reflecting that Fields was hospitalized at a psychiatric hospital as a teenager, during which time he was diagnosed with PTSD and evaluated as potentially having bipolar disorder; and his inmate grievance reports, submitted while he was awaiting trial, which contain complaints that

his prison guards were conspiring to murder him, and "clearly evidence paranoid ideation and delusional thinking."

We conclude that jurists of reason would not disagree with the district court's holding, because Fields does not show that his competency fell below a standard that would have required the district court to deny his request to represent himself.  Dr. Woods's declaration, executed in 2010, six years after Fields's trial, is not sufficient to establish that the district court's careful and reasoned decision that Fields was competent to waive counsel is debatable.  We note that the district court reached its conclusion after considering Fields's *pro se* oral motion for access to a law library and his motion to change venue, questioning Fields about his decision to waive counsel, speaking with Fields's counsel about his competency, arranging for Fields's psychiatric evaluation by Dr. Mark, and considering the results of Dr. Mark's evaluation.  Reasonable jurists would not debate the district court's conclusion that its inquiry into the issue demonstrated that Fields "ha[d] sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and a "rational as well as factual understanding of the proceedings against him."  *Dusky*, 362 U.S. at 402.  Considering all the circumstances, and acknowledging that "the trial judge . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant," *Edwards*, 554 U.S. at 177, we conclude that the district court's holding is not debatable.

Fields argues that his delusional belief that his attorneys were conspiring against him was not rational, and that therefore, he did not have the requisite rational understanding of the proceedings against him or the present ability to consult his attorney.  This argument is unpersuasive. Reasonable jurists would not disagree with the district court's conclusion that the factors noted above—Fields's demeanor at trial, his *pro se* motions, and Dr.

Mark's evaluation—indicate that Fields was competent to waive his right to counsel.

Fields's reliance on documents from his teenage years suggesting PTSD and bipolar disease, and his inmate grievance reports, is unavailing. The documents regarding Fields's psychiatric evaluations as a teenager date from 1989. As such, they do not call into question the district court's conclusion about Fields's rational understanding of the proceedings against him, or his ability to consult with his counsel, at the time of his trial twenty-five years later. Similarly, the inmate grievance reports date from April through July of 2003, approximately six months before Fields's trial began in January 2004, and likewise would not cause reasonable jurists to disagree with the district court's conclusion about Fields's competency at the time of trial.

Fields's reliance on *Edwards* is also unavailing. The district court concluded that *Edwards* had no bearing, because the case provides the trial court with "discretionary authority" to consider competency under a higher standard, but does not so require. Reasonable jurists would not disagree with the district court. As we have recently explained, "in *Edwards*, the Supreme Court addressed the constitutionality of the denial of the right to self-representation; the Court did not address the competency of a defendant who is granted the right to self-representation, nor did it suggest that a trial court which allows a defendant to represent himself is required to first ascertain that he is capable of doing so." *United States v. West*, --- F. App'x ---, 2014 WL 1797725, at *1 (5th Cir. May 7, 2014); *see also Panetti*, 727 F.3d at 414 (noting that *Edwards* is permissive). Thus, reasonable jurists would not debate that *Edwards* is not applicable here. Even assuming *Edwards* is relevant, Fields has not shown that his competency fell below a standard that would have required the district court to deny his request to represent himself. *See id.*; *Edwards*, 554 U.S. at 178.

No. 13-70025

Based on the lack of probative evidence tending to show incompetence, we cannot say that reasonable jurists would find the district court's decision debatable or wrong. *See Wilkins v. Stephens*, --- F. App'x ---, 2014 WL 1202524, at *10 (5th Cir. Mar. 25, 2014).

b.  Adequacy of the district court's pretrial inquiry

Fields contends that the district court erred by relying on Fields's counsels' failure to contest competency "as proof of Fields'[s] competency"; relying on Dr. Mark's evaluation, which was "wholly uninformed"; relying on Dr. Price's evaluation of Fields's academic potential; conducting a hearing of only one minute in duration; and failing to consider if Fields's waiver of counsel was rational.  The district court rejected Fields's arguments, holding that Dr. Mark's thirty-minute examination, "coupled with" Fields's demeanor at trial, his attorneys' observations, and Dr. Price's evaluation focusing on his intelligence, did not deprive Fields of his constitutional rights.  Fields suggests that the district court's holding is wrong, entitling him to relief.

For the reasons noted *supra*, reasonable jurists would not debate the district court's holding that Fields was competent to waive his right to counsel. Similarly, reasonable jurists would not debate the district court's determination that its pretrial inquiry into Fields's competency was adequate. The district court considered several factors in finding Fields competent, including its interactions with him, his *pro se* motions, counsels' interactions with him, and Dr. Mark's evaluation.  The district court did not rely on any single factor as "proof" of Fields's competency.

Fields's argument that the hearing does not satisfy due process because it lasted only one minute is unavailing.  In fact, the competency hearing was spread over two days, and involved the district court consulting Fields, counsel for both sides, and Dr. Mark.  Contrary to Fields's contention, in rejecting his § 2255 petition, the district court did consider whether his waiver was rational,

and concluded that Fields had the ability to consult with counsel "with a reasonable degree of rational understanding and that he had a rational understanding of the criminal proceedings against him." For these reasons, reasonable jurists would not debate the district court's holding that its inquiry did not violate Fields's constitutional rights.

### c. Ineffective assistance of counsel

Fields contends that his counsels' performance was deficient because counsel failed to conduct an investigation into his competence. The district court held that counsels' performance "was neither deficient nor prejudicial." Given our analysis, *supra*, Fields cannot establish prejudice, even if his counsels' performance had been deficient. *See Strickland*, 466 U.S. at 700 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim."). Thus, Fields has not shown that reasonable jurists would disagree with the district court's holding.

## C. Practice Cross-Examination

Fields argues that the district court required him to reveal privileged trial strategy in violation of his Fifth, Sixth, and Eighth Amendment rights when it compelled him to conduct a "dry run" of his cross-examination of Scroggins. We deny a COA because reasonable jurists would not debate the district court's conclusion that the practice cross-examination ("dry run") did not violate Fields's constitutional rights.

### 1. Factual Background

During the trial, the government called Shalaykea Scroggins to the witness stand. As the district court explained, Scroggins testified that:

> (1) she was [Fields's] girlfriend; (2) she knew that the murder victim, Ms. Coleman, was [Fields's] other girlfriend; (3) she was aware that [Fields] had implicated her as the murderer; (4) she had never threatened Ms. Coleman with bodily injury; and (5) [Fields] admitted to Ms. Scroggins that he had murdered Ms.

37

Coleman by luring her away from the hospital, driving her to Downsville, and then shooting her twice in the head.

Fields then conducted his cross-examination of Scroggins. Fields's cross-examination resulted in numerous objections that the court sustained based on form, relevancy, and content. Fields argued with the witness, asked questions that were repetitive, and sought to elicit hearsay testimony. Fields tried to read from documents not in evidence. Fields offered his own commentary on matters and made arguments under the guise of asking questions.

The district court dismissed the jury, and determined that it would proceed by having Fields read questions to the witness from his prepared list of questions, after which the government would object if it had any objections. If the court sustained the objection, Fields would remove the question from his list of questions to ask the witness before the jury the next day. The district court explained, "There's no point in having the jury sit here for an interminable length of time listening to questions that are objected to and the objection is sustained when they're merely an attempt by you to get things into the record improperly, Mr. Fields." The district court concluded the dry run once it determined that Fields had asked all his prepared questions, and the dry run had reached a point where "Fields is not only discussing with Mr. Swanton every single question, he's asking half a question and then going back to Mr. Swanton to find out what the other half of the question is supposed to be," which is "entirely counterproductive" and "something that we can't do in front of the jury tomorrow."

Fields completed his cross-examination of the witness without incident the next day, January 28, 2004.

2. Applicable Law

No. 13-70025

The Sixth Amendment entitles a defendant to "'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *United States v. Hitt*, 473 F.3d 146, 156 (5th Cir. 2006) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). "'The Confrontation Clause . . . is satisfied where defense counsel has been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.'" *Id.* (quoting *United States v. Restivo*, 8 F.3d 274, 278 (5th Cir. 1993)).

"Trial courts retain wide discretion 'to limit reasonably a criminal defendant's right to cross-examine a witness based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Id.* (quoting *Michigan v. Lucas*, 500 U.S. 145, 149 (1991)) (internal quotation marks omitted); *see also United States v. Mizell*, 88 F.3d 288, 292 (5th Cir. 1996) ("A district court has broad discretion to reasonably restrict cross-examination; however, this discretion is limited by the Sixth Amendment.").

Federal Rule of Evidence 611 provides: "The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a). The rule "permits courts to preclude questions that obscure truth because they are ambiguous, confusing, misleading, argumentative, compound, or assume facts not in evidence." 28 Charles Alan Wright, et al., Federal Practice & Procedure § 6164 (2d ed. 2014) (footnotes omitted). "Subdivision (a) also provides a basis for controlling questions that waste time because they are collateral, cumulative or repetitive, have been asked and answered, or call for speculation." *Id.*

3. Analysis

The district court denied relief on Fields's claim, holding that the dry run did not violate Fields's constitutional rights because it was necessary "to filter out" his "improper and repetitious questions to avoid the needless consumption of time." Reasonable jurists would not debate the district court's determination that its decision to perform the dry run was proper under the circumstances and did not violate Fields's rights. The district court's decision to conduct the dry run fell within its discretion "to limit reasonably a criminal defendant's right to cross-examine a witness based on concerns about . . . harassment, prejudice, confusion of the issues . . . or interrogation that is repetitive or only marginally relevant," *Hitt*, 473 F.3d at 156 (internal quotation marks omitted), and to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence," Fed. R. Evid. 611(a). The district court conducted the dry run because of Fields's repeatedly unsuccessful efforts to cross-examine Scroggins without offering his own arguments, seeking to introduce hearsay, or reading from exhibits that had not been introduced and were of questionable relevancy, among other issues. The district court explained that there would be "no point in having the jury sit here for an interminable length of time" while Fields attempted "to get things into the record improperly." The district court noted that Fields was "taking the opportunity to make speeches and to make statements that [he] otherwise wouldn't be able to make and that's not appropriate." These statements indicate that the district court determined it was necessary to perform a dry run to avoid wasting time and permitting Fields to continue to "testify" through his cross-examination. Accordingly, reasonable jurists would not debate the district court's holding.

Fields was still accorded the opportunity to perform his cross-examination of Scroggins. *See Hitt,* 473 F.3d at 156. The jury heard

No. 13-70025

Scroggins's answers to Fields's questions, and was able to evaluate Scroggins's demeanor and credibility over the course of two days of direct and cross-examination testimony. Thus, Fields was able to "expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id.*

Fields claims that the jury was denied the opportunity to judge Scroggins's credibility based on "fresh and candid reactions." However, Fields had the opportunity to develop additional questions with his standby counsel after the dry run, and apparently took that opportunity. *See* January 27, 2004 Trial Transcript (District court: "Y'all can stay up all night, if you can convince [your standby counsel] to do that, trying to construct the questions that you want to ask."). Thus, many of the questions that Fields asked Scroggins in front of the jury on January 28, 2004, were not asked during the January 27 dry run.[16] For these new questions and impeachment evidence, the jury had an opportunity to evaluate Scroggins's candid reaction, since she had not been asked these questions before.

As to the questions that Fields asked during the dry run and then again in front of the jury, Scroggins's reactions on January 28 admittedly were not as "fresh and candid" as they might have been. However, given the circumstances, including Fields's numerous attempts to testify and argue with Scroggins under the guise of conducting a cross-examination, reasonable jurists would not debate the district court's holding that its decision to conduct the dry run in Scroggins's presence was not unreasonable. *See Hitt*, 473 F.3d at 156. Additionally, we note that the dry run only became necessary because

---

[16] *Compare* January 28, 2004 Trial Transcript *with* January 27, 2004 Trial Transcript (asking questions not asked the prior day about the witness's relationship with Edward Outley; the evening of November 6, 2001, when the witness saw Fields "scraping something off of [his] clothes"; the date the witness was arrested; and Fields's phone call to the witness after the murder; Fields also offered a letter into evidence to impeach the witness).

of Fields's decision to represent himself, and "[t]he right of self-representation is not a license to abuse the dignity of the courtroom," nor "is it a license not to comply with relevant rules of procedural and substantive law." *Faretta*, 422 U.S. at 834 n.46.

Fields's reliance on *Wardius v. Oregon*, 412 U.S. 470, 479 (1973), is misplaced. As Fields notes, the Court in *Wardius* stated that "discovery must be a two-way street," *id.* at 475, and that "[i]t is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State," *id.* at 476. However, the Court in *Wardius* addressed a state statute that required defendants to reveal details of any alibi defense in advance of trial, while granting "no discovery rights to criminal defendants." *Id.* at 475. The issue here does not concern pre-trial discovery. Moreover, because the government had already performed its direct examination when Fields conducted his cross-examination and dry run, he was not required to "divulge the details of his own case" while facing any risk of surprise concerning the government's refutation of the evidence on which he planned to rely. *Id.*

Although Fields argues that the government's objections "created a severe risk of witness coaching," he does not contend that witness coaching took place. Furthermore, there is no indication of coaching, such as through baseless objections or the use of non-verbal cues.[17] In fact, the prosecution's objections were not baseless, and nearly all were sustained.

---

[17] *See, e.g., United States v. Jones*, 180 F.3d 261, 1999 WL 274441, at *3 & n.4 (5th Cir. Apr. 15, 1999) (unpublished table decision) (finding no prosecutorial misconduct where defendant accused the government of coaching the witness by using "nods of the head"); *McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 360 (9th Cir. 1996) (finding no misconduct where party asserted that attorney "attempt[ed] to coach witnesses with baseless objections").

Fields also claims that his appellate counsel's failure to raise the issue on direct appeal constitutes ineffective assistance.  The district court denied relief on this claim because it concluded that Fields could not show that his counsels' conduct was deficient or prejudicial in light of the district court's rejection of his claim on the merits.   Given our analysis, *supra*, reasonable jurists would not debate the district court's holding.  *See Strickland*, 466 U.S. at 700.

We conclude that reasonable jurists would not debate the district court's determination that Fields failed to establish that the dry run violated his constitutional rights, and deny a COA on this basis.

### D. *Brady* Violations

Fields argues that the government failed to disclose critical impeachment evidence.  Specifically, he contends that (1) the government committed *Brady* violations by failing to disclose the scope of Edward Outley's immunity deal or to disclose Homero DeLeon's handwritten notes; (2) the government failed to correct a false statement Outley made at trial; and (3) DeLeon acted under government direction in violation of Fields's Sixth Amendment rights.   We conclude that a COA should not issue because reasonable jurists could not disagree with the district court's conclusion that the government did not commit any *Brady* violations.

### 1. Factual Background

Before Fields's trial, the government sent a letter to Edward Outley's attorneys, dated January 2, 2004 ("2004 Letter"), explaining the agreement between the government and Outley.  The 2004 Letter concerns Outley's cooperation in the investigation into Coleman's murder, and states that it "certif[ies] that your client is considered a witness in the case and not a target or subject of the investigation."  The 2004 Letter continues:

No. 13-70025

Correspondingly, any statement or testimony, or evidence derived directly or indirectly from the statements or testimony which your client provides regarding this matter or any other matter into which he may be inquired by any agent or attorney associated with this case or any testimony furnished to a grand or petit jury will not be used against him in this or any further criminal proceeding, either federal or state, except a prosecution for perjury or otherwise making a false statement.

This grant of immunity is completely conditional upon Mr. Outley's truthful, candid cooperation and is voidable by the United States in the event it can demonstrate to a court that Mr. Outley has made a material misstatement of fact to the Court or ceases to cooperate in this case.

Fields received the 2004 Letter as part of the discovery process. In Fields's § 2255 motion, he includes an affidavit from Outley stating that Outley "did not want to testify against Mr. Fields." In particular, the affidavit stated:

The only reason I testified is because the Government gave me complete immunity for any charges. Thus, because I could not be prosecuted for any crimes, I had to testify—my attorneys told me I could not take the Fifth on anything.

At trial, Outley testified that he provided Fields with a gun, but did not shoot Coleman and was not present when she was shot. On cross-examination, Fields asked Outley the following question: "And, Mr. Outley, at one point -- Mr. Outley, have [sic] the government made you any promises, or --." Outley responded, "No. The government hasn't made me any promises."

Turning to Homero DeLeon, in November 2003, Assistant United States Attorney Gregory Gloff and Special Agent Douglas J. Kunze, with the Bureau of Alcohol, Tobacco, Firearms and Explosives, interviewed DeLeon. DeLeon stated that he had been Fields's cellmate in November 2001, prior to Fields's escape, and then again in November 2002. DeLeon stated that Fields told him how he escaped from prison by digging "through a vent in the ceiling with a light switch plate and metal part from a shower." DeLeon stated that Fields

44

told him that he had killed his girlfriend, and told him "about a tree where he killed his girlfriend."

At trial, DeLeon testified along similar lines. He stated that he had previously provided testimony for the government in a different case in order to receive a reduced sentence. He replied affirmatively when asked if the government had filed a motion to reduce his existing sentence for cooperating in *Fields*.

In Fields's § 2255 motion, he included the affidavit of Rick Ojeda, a former FBI agent and police officer, who interviewed DeLeon in December 2008. Ojeda stated that during the interview, DeLeon reported that Fields informed him that "Fields escaped from the jail by crawling through a vent, carjacked an old lady and drove to the hospital, picked up his girlfriend, and then drove her to a deserted location where he shot her." Ojeda stated that DeLeon informed him that he had prepared ten or eleven pages of handwritten notes based on his conversations with Fields, which he sent to Assistant United States Attorney Gloff without retaining a copy.

2. Analysis

The district court held that Fields failed to establish that the government violated his rights. We conclude that reasonable jurists would not debate the district court's holding. Our analysis will proceed in three parts: (1) the *Brady* violations, including the government's alleged failure to disclose the scope of Outley's immunity deal and to disclose DeLeon's notes; (2) the government's failure to correct Outley's statement at trial; and (3) the claim that DeLeon acted under government direction.

a. *Brady* violations

   i. Government's alleged failure to disclose Outley's immunity agreement

No. 13-70025

The district court denied relief on Fields's claim, explaining that Fields did not provide "any evidence of such a broad and undisclosed immunity agreement," and holding that the government fulfilled its obligations by disclosing the 2004 Letter to Fields. The district court concluded that even if a broader immunity agreement existed, Fields could not establish a reasonable probability that the evidence would have changed the result of the proceeding. We deny a COA on Fields's claim because jurists of reason would not disagree with the district court's holding.

"There are three components to a *Brady* violation. First, the evidence must be favorable to the accused, a standard that includes impeachment evidence. Second, the State must have suppressed the evidence. Third, the defendant must have been prejudiced." *United States v. Hughes*, 230 F.3d 815, 819 (5th Cir. 2000). To establish the third element, a defendant must show that the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (internal quotation marks omitted). "The defendant has the burden to establish a reasonable probability that the evidence would have changed the result." *Id.*

Fields cannot show that the government suppressed any evidence. He does not establish that Outley received a broader immunity agreement than that outlined in the 2004 Letter, which the government provided to Fields before trial. Taken alone, Outley's statement in his affidavit that he only testified "because the Government gave me complete immunity for any charges" would not cause reasonable jurists to debate the district court's holding. As the government suggests, it is likely the case that "[t]o the extent Outley's description of immunity differed from the immunity described in the January 2, 2004 letter, those differences are . . . the result of confusion."

Even if the government failed to disclose a broader immunity grant, it is not debatable that Fields cannot show prejudice. The jury already knew that

46

Outley was testifying in part because he was concerned that he might face additional criminal charges. Knowing the extent of the scope of Outley's immunity would not have affected the jury's perception of Outley or his testimony. Moreover, the jury heard substantial evidence from other witnesses supporting Fields's convictions, which Fields has not rebutted or shown to be unreliable. Accordingly, Fields has not established that jurists of reason would debate the district court's holding that there is no reasonable probability that the allegedly suppressed evidence would have changed the result of the proceeding.

ii.    Government's alleged failure to disclose DeLeon's notes

The district court denied relief on Fields's claim, concluding that the missing notes did not constitute favorable evidence because they would largely corroborate "DeLeon's compelling testimony at trial as to [Fields's] confession to murdering Ms. Coleman." We deny a COA on Fields's claim because jurists of reason would not disagree with the district court's holding. Again, Fields cannot show that the government suppressed any evidence. DeLeon wrote a letter to the prosecutor in February 2003, describing his potential testimony, in which he did not reference the existence of any notes. Similarly, Assistant United States Attorney Gloff and Special Agent Kunze interviewed DeLeon in November 2003, and their report did not mention the existence of any notes. Coupled with the government's use of open-file discovery, these facts strongly indicate that there were no notes.

The district court held that even if the notes could have shown inconsistencies in DeLeon's testimony, no prejudice resulted because other witnesses provided compelling testimony to support Fields's convictions, and Fields thus failed to show there was a reasonable probability that the proceeding would have been different. Reasonable jurists would not debate the district court's holding. Fields places much import on discrepancies between

the facts in DeLeon's report to Ojeda and DeLeon's testimony. However, these inconsistencies concern the timeline of events, and not the occurrence of the events. The testimony at trial established that Fields did, in fact, escape from jail, carjack a woman, pick up Scroggins from a hospital, and kill her in a deserted location, as DeLeon reported to Ojeda. The carjacking took place later, as did Fields's attempted escape through a vent, but DeLeon's statement that each of these events occurred is correct. Therefore, Fields has not shown that the district court's conclusion, that there is no reasonable probability DeLeon's missing notes would have changed the trial's outcome, is debatable.

For these reasons, we deny a COA as to Fields's *Brady* claims.

b. Government's failure to correct Outley's statement at trial

The district court rejected Fields's argument, holding that Fields could not establish that Outley's testimony was false and that the government knew it was false, given that Fields never asked the specific question whether Outley "had received any promises in exchange for his testimony against" Fields. The district court also concluded that Outley's testimony was not material. We deny a COA because Fields has not shown that reasonable jurists would debate the district court's holding.

"'[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment . . . . The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'" *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). "A *Napue* violation may occur not only when the prosecuting attorney knows that a witness's testimony is false, but also when another government attorney knows of the false testimony and does nothing to correct it." *Id.* "To establish a due process violation based on the government's use of false or misleading testimony, [a defendant] must show that (1) the testimony

in question was actually false; (2) the testimony was material; and (3) the prosecution had knowledge that the testimony was false." *United States v. Webster*, 392 F.3d 787, 801 (5th Cir. 2004).

Assuming without deciding that Outley's statement that "[t]he government hasn't made me any promises" is false in light of his immunity deal, reasonable jurists would not debate the district court's holding because Outley's testimony is not material. As we have explained, "we have limited material lies to those that occur as a part of the prosecution's case." *O'Keefe*, 128 F.3d at 894. "Thus, when the defense elicits the alleged perjury on cross-examination, no material falsehood has occurred because the government has not itself knowingly presented false testimony." *Id.* In *O'Keefe*, the court concluded that falsehoods were not material because "falsehoods, to the extent that any were uttered, occurred as a result of the defense's cross-examination, not from testimony elicited by the prosecution." *Id.* at 896. Here, the falsehood also occurred during cross-examination. As a result, the testimony is not material. *Id.*

Moreover, the jury knew Outley was serving an eight-year sentence at the time he testified, and that he was testifying in part because he was concerned he might face additional criminal charges. Therefore, the jury heard information sufficient to evaluate Outley's credibility in light of a potential immunity deal with the government. *See id.* at 894. Based on these considerations, Fields has not shown that the district court's holding was debatable.

c. Whether DeLeon acted under government direction

The district court rejected Fields's claim that DeLeon acted as a government agent, in violation of Fields's Sixth Amendment rights, finding "no evidence demonstrating that the [g]overnment directed or otherwise knowingly exploited Mr. DeLeon to act as a [g]overnment agent in eliciting

information from" Fields.  We deny a COA on Fields's claim because jurists of reason would not disagree with the district court's holding.

The Supreme Court has "held a criminal defendant may not have 'used against him at his trial evidence of his own incriminating words, which federal agents had deliberately [and surreptitiously] elicited from him after he had been indicted and in the absence of his counsel.'" *Henderson v. Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006) (quoting *Massiah v. United States*, 377 U.S. 201, 206 (1964)) (alteration in original).  A *Massiah* violation has three elements: "(1) the Sixth Amendment right to counsel has attached; (2) the individual seeking information from the defendant is a government agent acting without the defendant's counsel's being present; and (3) that agent 'deliberately elicit[s]' incriminating statements from the defendant." *Id.* (alteration in original).  "[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton*, 474 U.S. 159, 176 (1985).

Fields has not shown that the district court's holding is debatable.  DeLeon testified that he elicited as much information as he could from Fields so that he could *then* pass that information to the government.  He had previously cooperated with the government and saw an opportunity to do so again.  Similarly, his letter to the government outlines steps that he took *prior* to communicating with prosecutors.  The record thus shows that DeLeon was not acting at the direction of the government.  There is no evidence demonstrating that the government "directed or otherwise knowingly exploited" DeLeon to act as a government agent.  Accordingly, jurists of reason would not debate the district court's rejection of Fields's *Massiah* claim.  *See United States v. Cutno*, 431 F. App'x 275, 280 (5th Cir. 2011) (rejecting *Massiah* claim where the "district court found no evidence to demonstrate that [witness]

was acting at the Government's behest at the time that [defendant] made his confession to [witness]").

**E. Actual Innocence**

Fields argues that he has "set forth specific factual allegations supporting his actual innocence of the murder of Suncerey Coleman." He contends that: forensic evidence could establish his innocence, and seeks additional DNA testing; Scroggins and Outley "offered patently false testimony at trial"; and the testimony of jailhouse informants was false and unreliable. The district court rejected each of Fields's contentions. Because we conclude that reasonable jurists would not debate the district court's holding, we deny a COA.

1. Applicable Law

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Rather, Rule 6(a) of the Rules Governing § 2255 Cases permits discovery "for good cause." Rule 6 of the Rules Governing 28 U.S.C. § 2255; *see also Bracy*, 520 U.S. at 904 (discussing Rule 6 of the Rules Governing 28 U.S.C. § 2254).[18] A petitioner demonstrates "good cause" under Rule 6(a) "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09 (internal quotation marks omitted). We have noted that Rule 6 of the Rules Governing § 2254 petitions "does not authorize fishing expeditions." *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994). "[T]he district court's decision regarding the

---

[18] Because Rule 6 of the Rules Governing § 2254 Cases is nearly identical to Rule 6 of the Rules Governing § 2255 Cases, and both use the same "good cause" standard, courts have looked to cases interpreting the former when applying the latter. *See, e.g.*, *Lafuente v. United States*, 617 F.3d 944, 947 (7th Cir. 2010); *Pizzuti v. United States*, 809 F. Supp. 2d 164, 175–76 (S.D.N.Y. 2011).

No. 13-70025

availability of discovery is . . . committed to the sound discretion of the district court, and is reviewed under the abuse of discretion standard." *Clark v. Johnson*, 202 F.3d 760, 765–66 (5th Cir. 2000).

"'Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.'" *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000) (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993)); *see also Moore*, 534 F.3d at 465 n.19. "Rather, a claim of actual innocence is a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Dowthitt*, 230 F.3d at 741 (internal quotation marks omitted). For a petitioner to obtain relief, "the evidence must establish *substantial* doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice unless his conviction was the product of a fair trial." *Id.* (internal quotation marks omitted).

   2. Analysis

We conclude that reasonable jurists would not debate the district court's rejection of Fields's actual innocence claim, and deny a COA. Initially, we note that our caselaw does not recognize freestanding actual innocence claims. *Dowthitt*, 230 F.3d at 741; *Moore*, 534 F.3d at 465. The district court rejected Fields's claim, finding it not cognizable. To the extent Fields makes a freestanding claim that he is entitled to habeas relief because he is actually innocent, reasonable jurists would not debate the district court's holding.[19]

---

[19] We also note that in Fields's brief, he only provides record cites to his habeas petitions in the district court (which, in turn, rely on earlier petitions), and at no point directs the court to evidence in the record or trial transcript that supports his claims. As a result, he may have waived his arguments by failing to adequately brief them. *See* Fed. R. App. P. 28(a)(8)(A); *United States v. Lopez*, 426 F. App'x 260, 263 (5th Cir. 2011) (unpublished); *see also United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010).

No. 13-70025

a. Forensic evidence

Fields contends that his § 2255 petition "established that no physical evidence was presented at trial that connected him to the murder of Suncery Coleman." He offers several "examples of situations where the forensic evidence he specifically requested in his DNA Motion could establish his innocence by contradicting the unreliable testimony upon which he was convicted."[20] The district court rejected Fields's argument, noting "there is no requirement that [Fields] be linked to the murder through a positive DNA test," and concluding that, "even assuming that the outcome of any DNA test would be favorable to [Fields], he has not established that such outcome would raise a reasonable probability of his actual innocence."

Fields argues that the district court ignored his factual allegations and erred in denying him relief. We conclude that reasonable jurists would not debate the district court's holding, because Fields's allegations are speculative

---

[20] Fields offers the following examples:

- Scroggins "testified that Fields had blood on his clothes and shoes the night of Coleman's death," but the red Pontiac Grand Am that Fields drove that evening "was forensically examined and tested, [and] produced no inculpatory evidence linking Fields to the crime."
- "The area where Coleman's body was located was covered in huge thorns that would have left cuts on anyone in that area, yet Fields, who was wearing shorts that night, was uninjured."
- "The blue Jaguar that the Government told the jury Edward Outley III and Scroggins were driving the evening of the murder actually had been wrecked and totaled in 1998."
- "The gold Jaguar that Outley and Scroggins were actually driving the evening of the murder was never forensically tested because Outley and Scroggins conspired to hide the car by falsely telling investigators that they were in a blue, rather than a gold vehicle."
- "The detective who took buccal swabs and a blood sample from Fields the night he was arrested falsely claimed to have found Fields'[s] blood on a .22 caliber gun (which was not alleged to be the murder weapon), but Fields had no injuries that would have left his blood on that weapon that night."

and conclusory, they do not give "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief," *Bracy*, 520 U.S. at 908–09, and they therefore do not show "good cause" as required under Rule 6(a).

Fields's first "example," his observation that the red Pontiac Grand Am he drove the evening of Coleman's murder "was forensically examined and tested, [and] produced no inculpatory evidence linking Fields to the crime," does not support his argument that he is entitled to discovery. Fields cannot show that his claim is debatable simply by pointing to a lack of physical evidence on one issue; this is not the type of "specific allegation[]" that would give us "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09. This is particularly true, we note, when there was compelling evidence of guilt presented at trial. Moreover, Fields does not acknowledge that at trial, there was testimony that the Grand Am "looked like it had been detailed [and] wiped down." When the investigating team submitted the car for examination, they did not expect anything to be found, "given how clean the car" was. *See also* January 29, 2004 Trial Transcript (testimony of James Blair) (stating that the car had "suspicious stains that could possibly be blood").

Fields's observation that the "[t]he area where Coleman's body was located was covered in huge thorns that would have left cuts on anyone in that area, yet Fields, who was wearing shorts that night, was uninjured," is similarly unhelpful. Again, Fields cannot establish that the district court's rejection of his discovery claim is debatable simply by noting the absence of a particular piece of evidence he asserts should exist—here, cuts on Fields's legs—without any "specific allegations." *See Bracy*, 520 U.S. at 908–09. Fields provides no factual or record support for his conclusory statement that he was uninjured. (Additionally, Fields offers no explanation for the logical response

that he could have cut his legs on thorns during the November 6th murder of Coleman, and that those cuts could have healed by his November 24th capture, more than two weeks later.)

Fields's remaining examples amount to conclusory assertions, with no specificity; he does not indicate how these assertions would establish his entitlement to discovery.  He also provides no support for his contention that "[t]he detective who took buccal swabs" from him "falsely claimed to have found Fields'[s] blood on a .22 caliber gun."  Accordingly, Fields's "examples" fail to cause reasonable jurists to debate the district court's rejection of Fields's claim.

### b.  DNA testing

The district court rejected Fields's argument that he was entitled to DNA testing, holding that Fields "fails to show how any new DNA or forensic evidence testing would constitute direct evidence of his innocence."  The court explained that, "[g]iven the compelling evidence of guilt presented at trial, the Court does not conclude that any DNA testing would raise a reasonable probability of [Fields]'s actual innocence."

We conclude that reasonable jurists would not debate the district court's holding, because we are not persuaded by Fields's arguments that additional DNA testing should be performed on hairs found on Coleman's clothing, a fingernail clipping from Coleman, and Coleman's body and clothing.  Fields fails to argue that he satisfies the requirements of 18 U.S.C. § 3600.  "To secure court ordered testing of DNA an applicant must satisfy each of the ten prerequisites enumerated in the statute."  *United States v. Fasano*, 577 F.3d 572, 575 (5th Cir. 2009).  Accordingly, he fails to adequately brief the issue, *Scroggins*, 599 F.3d at 446–47, or establish his entitlement to testing under § 3600.

Additionally, Fields does not acknowledge that Coleman's clothing was provided to evidence technicians and analyzed.  *See* January 27, 2004 Trial

No. 13-70025

Transcript (testimony of Jill Urban), *id.* (testimony of Jacqueline Harris). Similarly, Coleman's fingernails from her left hand were collected and analyzed for DNA. *Id.* (testimony of Katherine Long); January 28, 2004 Trial Transcript (testimony of Jill Urban on recall). Moreover, Fields's arguments for why *additional* DNA testing, beyond that already conducted, should be performed on Coleman's body and clothing are conclusory and speculative. Fields's apparent suggestion that Coleman's body should be exhumed for further testing, without more, amounts to a fishing expedition. *See Ward*, 21 F.3d at 1367.

Fields suggests that *Fasano*, 577 F.3d 572, supports his "right to DNA testing and a hearing" on his claim. In *Fasano*, the petitioner argued that he met all ten requirements of 18 U.S.C. § 3600(a), two of which were contested in the appeal. *Id.* at 575. The *Fasano* court concluded that the petitioner met the two requirements at issue. *Id.* Here, however, Fields has not argued that he satisfies the requirements of § 3600(a).[21] Accordingly, *Fasano* does not help his claim.[22]

For these reasons, reasonable jurists would not debate the district court's holding that Fields is not entitled to additional DNA testing.

    c.  Testimony of Scroggins, Outley, and jailhouse informants

---

[21] Additionally, Fields likely cannot satisfy the third requirement of § 3600(a), which provides, in relevant part, that the "specific evidence to be tested . . . was not previously subjected to DNA testing." 18 U.S.C. § 3600(a)(3). Fields has not argued that his request falls under one of the exceptions provided for in that subsection, for example, that although the evidence was tested before, "the applicant is requesting DNA testing using a new method or technology that is substantially more probative than the prior DNA testing." *Id.* § 3600(a)(3)(B).

[22] Fields's two-sentence argument that the "continued refusal to provide Fields with access to the requested DNA evidence also violates Fields'[s] right under the Eighth Amendment to be free of cruel and unusual punishment," is similarly unconvincing. Fields cites no caselaw in support of his argument, and fails to adequately brief the issue. *Scroggins*, 599 F.3d at 446–47.

No. 13-70025

The district court rejected Fields's argument that Scroggins and Outley provided false testimony, and that jailhouse informants similarly provided false and unreliable testimony. The court explained that Fields "provides no corroborating evidence to support his allegations that various government witnesses gave false testimony at trial," and "failed to provide sufficient specific allegations to demonstrate that any of his discovery requests will yield evidence to support any of his grounds for relief." We conclude that reasonable jurists would not debate the district court's holding, because Fields identifies supposed inconsistencies in these witnesses' testimony, but offers no evidence suggesting that the witnesses lied or were otherwise unreliable. His conclusory allegations do not give the court "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09.

For these reasons, we conclude that reasonable jurists would not debate the district court's holding that Fields failed to establish his actual innocence or his entitlement to additional DNA testing or discovery on his claim, and we deny a COA on this basis.

### F. *Allen* Charge

The district court held that Fields could not relitigate his *Allen* charge claim because we resolved it on direct appeal. We conclude that reasonable jurists would not debate the district court's holding, since we rejected Fields's claim on direct review, *Fields*, 483 F.3d at 340, and it is therefore barred from collateral review, *United States v. Rocha*, 109 F.3d 225, 230 (5th Cir. 1997); *Kalish*, 780 F.2d at 508. Accordingly, we deny a COA.

### G. Security Measures

Fields argues that his constitutional rights were violated (1) when the district court required him to wear a stun belt, (2) by his conditions of confinement during trial, and (3) by the security measures during trial,

including the increased presence of United States Marshals and the Marshals' role in escorting jurors to their cars during the penalty phase of the trial.

The district court held that Fields could not relitigate his stun belt claim because we resolved it on direct appeal.  Reasonable jurists would not debate the district court's holding, since we rejected Fields's claim on direct review, *Fields*, 483 F.3d at 356–57, and it is therefore barred from collateral review, *Rocha*, 109 F.3d at 230, *Kalish*, 780 F.2d at 508.  Fields's contention that his actual innocence claim allows him to overcome any procedural bar fails because he does not establish his actual innocence.

The district court rejected Fields's conditions of confinement arguments, finding that Fields cited no authority to support his claim and "presented no credible evidence to suggest that the nature of his detention adversely impacted his ability to represent himself at trial."  Reasonable jurists would not debate the district court's holding because Fields does not establish how his factual allegations about his conditions of confinement during trial implicate the Fifth or Sixth Amendments.  He articulates no connection between the single case he cites, a § 1983 case with language concerning the Eighth Amendment, and his claim that his confinement violated his right to self-representation.  Fields's conclusory allegations, without support, do not establish that his claim is debatable.[23]

Lastly, the district court denied relief of Fields's claim about the court's use of increased security measures, concluding that the balancing of interests "tipped in favor of additional security measures as it had been established that [Fields] was an escape risk with a history of violent behavior."  Scrutiny of security practices "must be balanced against the court's obligation to protect

---

[23] Because Fields fails to brief his argument that his conditions of confinement violated the Eighth Amendment, we do not consider it.  *See Scroggins*, 599 F.3d at 446–47.

No. 13-70025

the court and its processes, and to attend to the safety and security of those in the courtroom." *United States v. Nicholson*, 846 F.2d 277, 279 (5th Cir. 1988). This "balancing of competing interests is entrusted to the sound discretion of the trial court." *Id.* Prior to the trial, a United States Marshal reported to the district court on security concerns. The Marshal noted that Fields had a "violent criminal history," a "history of escape and escape attempts since he's been back in custody" after the murder, and had shown "aggressive" and "combative" behavior while in custody. As a result, the Marshal recommended increased security measures, which the district court employed. Given these facts, we conclude that reasonable jurists would not debate the district court's holding that additional security measures were appropriate.[24]

For these reasons, we conclude that reasonable jurists would not debate the district court's holding that Fields failed to establish that the security measures violated his constitutional rights, and deny a COA on this basis.

## H. Cumulative Error

"Under the cumulative error doctrine, relief may be obtained only when constitutional errors so fatally infect the trial that they violate the trial's fundamental fairness." *United States v. Stephens*, 571 F.3d 401, 412 (5th Cir. 2009) (internal quotation marks omitted). Where the district court does not commit an error, there can be no cumulative error. *Id.* The district court rejected Fields's claim because it determined that "[n]o error was committed during" either phase of the trial. We conclude that reasonable jurists would not debate the district court's holding, because Fields fails to establish that the district court committed any error; like the petitioner in *Stephens*, Fields's

---

[24] Fields provides no support for his assertion that the district court had *ex parte* contact "with at least one juror that suggested Fields was dangerous." Accordingly, we hold this argument waived. *See Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 857 (5th Cir. 2014).

cumulative error argument "essentially summarizes the other issues raised on appeal." *Id.* at 411. Accordingly, we deny a COA.

## I. Discovery and Evidentiary Hearing

Fields contends that he is entitled to an evidentiary hearing on his claims. In a § 2255 proceeding, a hearing is required "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). We review a district court's refusal to grant an evidentiary hearing on a § 2255 motion for abuse of discretion. *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006).

The district court held that Fields was not entitled to an evidentiary hearing because the record and written submissions were sufficient to dispose of each ground for relief. We conclude that reasonable jurists would not debate the district court's holding because the record and Fields's motion are adequate to dispose of each of Fields's claims. *See United States v. Plewniak*, 947 F.2d 1284, 1290 (5th Cir. 1991) (finding no error where district court refused to hold hearing).

Fields also contends that he is entitled to discovery on several of his claims. As we noted before, "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy*, 520 U.S. at 904. A petitioner demonstrates "good cause" for discovery under Rule 6(a) "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09 (internal quotation marks omitted).

The district court held that Fields was not entitled to discovery because he "failed to provide sufficient specific allegations to demonstrate that any of his discovery requests will yield evidence to support any of his grounds for relief." Reasonable jurists would not debate the district court's holding because

No. 13-70025

Fields has not provided specific allegations that lead us to believe he could demonstrate his entitlement to relief if the facts are fully developed. *Bracy*, 520 U.S. at 908–09. Accordingly, we deny a COA on Fields's claim concerning his entitlement to discovery and evidentiary hearing.

## IV.   CONCLUSION

For the foregoing reasons, we DENY a COA as to all of Fields's claims.